AUGUST LINDQUIST, Administrator of the Estate of EDWARD WILLIAM LINDQUIST, Deceased, Appellant, v. KING's CROWN PLASTER Co. Appellee.

**Master and servant:** VOLUNTEER SERVICE:  EVIDENCE.  A servant who leaves the work at which he is employed, and of his own volition goes to assist another employé in the repair of machinery,

is a mere volunteer, for whose injury while thus engaged the master is not liable, even though the master may have been negligent in failing to properly guard the machinery. Evidence held to show that the servant in the instant case was voluntarily, and without any right growing out of his employment, in a place of danger which precludes recovery for his injury and death.

**Same:** CONTRIBUTORY NEGLIGENCE. A servant who leaves the employment at which he is directed by a superior to work, and voluntarily goes to the assistance of another servant engaged in repairing machinery, in disobedience of orders, is guilty of contributory negligence precluding recovery for injury while thus engaged; even though it were shown that his general employment contemplates such assistance as he was rendering.

*Appeal from Cedar Rapids Superior Court.*— HON. J. H. ROTHROCK, Judge.

THURSDAY, JULY 9, 1908.

ACTION at law to recover damages for the death of Edward W. Lindquist, deceased, due as is alleged to defendant's failure to properly construct and guard its machinery. Trial to a jury. Directed verdict for defendant, and plaintiff appeals.—*Affirmed.*

*Rickel, Crocker & Tourtellot,* for appellant.

*Dawley & Wheeler,* for appellee.

DEEMER, J.— Plaintiff, as administrator of his son's estate, brings action to recover damages for the death of the son, Edward W. Lindquist, resulting from his being caught in a shaft in one of defendant's mills, and receiving injuries from which he died. It is claimed that the son was in defendant's employ, and that defendant negligently failed to perform its common-law and statutory duties in the construction and care of its machinery. Defendant denied all negligence on its part, pleaded contributory negli-

gence on the part of the son, and averred that when injured the boy was a mere volunteer, engaged in a dangerous work for which he was not employed, and against which he had been warned. A jury was called, and at the conclusion of plaintiff's evidence, on defendant's motion, a verdict was directed for defendant, and plaintiff appeals. We shall assume for the purposes of the case that defendant was guilty of negligence in not covering or guarding its machinery as required by section 4999a2 of the Code Supplement of 1907, and in not providing belt shifters as required by that act. And the only questions in the case as we view it are these: (1) Was defendant's failure to comply with the statute the proximate cause of the injury? (2) Was Edward Lindquist a volunteer in doing the service he was performing when injured? (3) Was he guilty of such contributory negligence as to defeat recovery by his administrator?

It appears from the testimony that when injured the boy was a little over sixteen years of age. Defendant is a corporation operating a brick plant and plaster mill in the city of Cedar Rapids. In connection with these, it was also operating a sand pumping plant. These plants were in different buildings something like seventy feet apart. Plaintiff's son was employed by defendant to work in the brick plant, and had been at this business about three months at the time he received his injuries. He was set to work at a machine called the " mixer." For two or three days prior to the time he received his injuries, the brick mill had not been running, and plaintiff was set to work peeling logs outside of and to the east of the plaster mill. Inside the plaster mill was what is known as a " fibroid machine," operated by a belt from a shaft some ten or twelve feet above the floor of the building. This shaft extended north and south, and was something like four feet from the west wall of the building. A belt came down from a pulley on this shaft to a pulley on the south side of the machine. About four feet

south of the shaft pulley the shaft was supported upon a post and cross-timbers, and at the side of this boxing was a collar around the shaft about an inch and one-half wide, which collar was fastened to the shaft by a set screw. One Whitsell, an employé of the defendant was in charge of the fibroid machine, and on the afternoon of the day when plaintiff's son received his injuries the belt which connected the shaft with the machine pulled apart where the ends were laced together. On the breaking of the belt, Whitsell got a ladder and set it up against the west wall of the building behind the shaft, so that it extended about a foot higher than the shaft, and about half way between the pulley and the boxing. Thereupon he undertook to repair the belting standing upon the floor near the machine. When the belt broke, Linquist was outside the building, engaged in peeling logs, and there was nobody in the room where the machine was housed save Whitsell. Without present direction from any one, Lindquist left his work and went into the room where Whitsell was at work, went up the ladder, and held the belt away from the shaft while Whitsell was repairing it. The shaft was two or three inches in diameter and a little rusty, so that, unless the belt were held away from it, it would pull upon the belt. Whitsell said that he did not need any help relacing the belt, that he could have done it himself, and that there was no necessity for any one to hold the belt away from the shaft. It very clearly appears that Whitsell did not ask or invite Lindquist to assist him in the repair of the belt, although it appears that he knew of his presence upon the ladder. One Knight was a superintendent of defendant's entire plant, and a man by the name of Louden was foreman of the plaster mill under Knight. While Lindquist was upon the ladder, holding the belt from the shaft, Louden came into the mill about the time the repairs upon the belt had been completed, and, noticing the boy, ordered him to get down from the ladder, to let the machinery alone, that he had no business up

there, and to go to his work of peeling logs. Lindquist got down, and went about the work which he was directed to perform. The belt was put in place, and within five minutes it again broke, and Whitsell proceeded to repair it again. When he commenced the lacing, there was no one upon the ladder.

We now quote from Whitsell's testimony verbatim regarding what occurred:

When the accident happened, I had not got the belt laced together, had only taken two stitches, and there were four to be taken altogether. It was about half done. I know nothing about Linquist coming in and going up the ladder, neither saw nor heard him; and nothing was said to me by any one. I did not ask Linquist to go upon the ladder the last time to hold the belt. I didn't need any help about doing the lacing. I could have done it myself. I did not need any one to hold the belt off the shafting. The first I knew of Linquist being there was the ladder broke and the belt flew out of my hands, and wrapped around him and the shafting. I then looked up, and he was whirling around the shafting. I ran at once, and shut off the machine. At the time I ran to shut off the machinery, there was no one else there in the room but Linquist and I. I had to go to the engine room some fifty or sixty feet to shut off the machinery. Then I came back, and ran through the other part of the room, and gave warning to Cy Louden, who was looking at him. When I knew something was wrong, that the ladder broke and the belt pulled out of my hand, and looked up and saw Linquist hanging, I couldn't tell in what way he was hanging, because he was whirling around the shaft. I could tell after I got back and had stopped the machine. He was hanging then facing the east. We thought his head was off when we first looked up there, but he was hanging by his arms, with his body on the west side of the shaft.

From the injuries received Linquist died the next day. Plaintiff claims that the boy's clothing was in some manner caught by the set screw which held the collar on the

shaft against the boxing, and that he was wound around the shaft and enveloped by the belt, and thus received his injuries. There is some dispute in the testimony or in the inferences to be derived therefrom regarding this matter, but, as we have said, we think there was enough to take the case to the jury upon the question of defendant's violation of the factory act to which we have referred being the proximate cause of the injury. The boy was not employed to work in the plaster mill, and the testimony shows he had never been in it prior to the day he received his injuries. His work was about the brick plant and primarily about the mixer, although his duties required him to oil some of the machinery in the brick plant before it started in the morning and at 1 o'clock in the afternoon. While this was his duty, the testimony shows that, if he did not get the machinery oiled before it was started, he would do it while running. It also appears that Superintendent Knight had warned Lindquist to keep away from the machinery save for oiling purposes. There was shafting in the brick plant, but it was close to the floor, and in repairing belts therefrom the men stood on the floor. It appears that Lindquist did assist Knight and others in repairing belts in the brick plant two or three times before the accident in question, but he never was about any of the machinery or assisted in belt repairs save in the brick plant. The facts so far recited clearly show that while defendant was perhaps at fault in not properly constructing or guarding its machinery, and that a jury may have found its failure in this respect was the proximate cause of the injury, yet it does not sufficiently appear that defendant owed any such duty to plaintiff's son as to make its failure actionable negligence. From the facts recited it clearly appears that the boy was a mere volunteer, who left the work at which he was employed, and of his own volition, and without direction from any superior, went to assist Whitsell in the repair of the belt. Moreover, it is manifest that his act in so doing

*1. MASTER AND SERVANT: volunteer service: evidence.*

was against the express command of the foreman of the building, and that, with knowledge of the dangers and contrary to express orders, he went upon the ladder and received the injuries of which he complains. This makes a clear case of contributory negligence. That a master is not liable to a mere volunteer who undertakes without a request and without his knowledge to assist a servant is too well settled to require the citation of authorities. But see, *Mellor v. Merchants Co.,* 150 Mass. 362 (23 N. E. 100, 5 L. R. A. 792); *Kauffman v. Maier,* 94 Cal. 269 (29 Pac. 481, 18 L. R. A. 124); *Cahill v. Hilton,* 106 N. Y. 512 (13 N. E. 339); *Flower v. Pa. R. R.,* 69 Pa. 210 (8 Am. Rep. 251); *Parent v. Nashua Co.,* 70 N. H. 199 (47 Atl. 261). And that the boy was guilty of contributory negligence in going upon the ladder and attempting to assist in the work against the express commands of his superiors, see, *Cahill v. Hilton,* 106 N. Y. 512–522 (13 N. E. 339).

But it is insisted on behalf of appellant that assisting in the repair of the belt as the boy did was a part of his duties, and that notwithstanding the orders of Louden, plain-

**2. SAME: contributory negligence.** tiff is entitled to recover. Even were it shown that the boy's general employment contemplated such assistance as he was rendering to the man engaged in repairing the belt, we do not see how to escape the conclusion that, when he was ordered away from the particular machinery about which he was engaged not more than five minutes before the accident occurred and was told to go about other work, his administrator can avoid the proposition that violation of this order was contributory negligence. Even if there were a former general order, it was manifestly superseded by this subsequent specific one to keep away from that particular machine, and not to assist in the work he was then attempting to perform. It is not a case of conflict of orders; but, at most, a general one, which was superseded by a subsequent specific one relating to the very work about which the boy was employed

when he received his injuries.    There is testimony that the deceased before his injury had held belts several times in the brick plant while they were being repaired, and that Knight directed him to do so.    But this is quite a different proposition from holding a belt while standing upon a ladder close to a boxing in the plaster mill.    There was also testimony to the effect that, when a belt broke, it was the duty of the first one there — that is, the first employé, the nearest one at hand — to assist in repairing the belt by holding it from the shaft.    But the witness who gave this testimony manifestly had reference to the employé in the particular building nearest at hand, not to any of defendant's employés, no matter what their work or employment.    What we mean is that the evidence does not show that Lindquist was ordered to hold belts away from all shafts about defendant's premises, or that his employment contemplated any work away from the brick plant except as he was specifically ordered to perform it.    His duties were in connection with the brick plant, and these were specifically pointed out, and, when that closed down, he was directed to go to peeling logs and not to assist in the plaster mill, and, when he went into that mill to hold the belt away from the shafting, he was not following his general orders.    But, if he were, he had been specifically directed on the day in question to peel logs.    This was to be performed away from the plaster mill, and he was not directed to perform any work therein.    Moreover, when his presence upon the ladder was discovered by the foreman, he was directed to leave the place immediately and to go to peeling logs.    There was no confusion regarding his orders, and no room for him to be deceived regarding his duties. The order to leave the ladder and go to work peeling logs was specific, and could not have been misapprehended. Surely, in view of these circumstances, he was not justified in going back to the fibroid machine, and upon the ladder from which he had been ordered as soon as he was discovered by the foreman.    In doing so he was not only a volunteer, but

a disobedient servant, who perversely disregarded the orders of his superior.

The trial court was clearly correct in directing the verdict, and its judgment must be, and it is, *affirmed.*